## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | | | |
|---|---|---|---|---|
| In re: | JOHN R. MILLER, | : | Chapter 13 | |
| | | : | | |
| | Debtor. | : | Bky. No. 13-16178 ELF | |
| | | : | | |

# O P I N I O N

## I.  INTRODUCTION

Many personal bankruptcy cases that are filed involve creditors who hold claims against the debtor for spousal or child support or other types of obligations arising out of a marital or parental relationship.  It is commonplace for such creditors either to:

(a) take the position that the automatic stay does not apply to them and forge ahead in state court; or

(b) seek a determination from the bankruptcy court that the automatic stay does not apply, or if it does, should be lifted to allow them to proceed in the nonbankruptcy forum.

As the present case illustrates, the determination of the scope of the automatic stay when bankruptcy law and family law collide in this way requires a careful review of both the factual record in the case and the text of several provisions of the Bankruptcy Code.

Debtor John R. Miller ("the Debtor") filed a chapter 13 bankruptcy case in this court on July 15, 2013.  On October 7, 2013, Joanne Miller ("Ms. Miller"), the Debtor's former spouse, filed the Motion for Relief from the Automatic Stay ("the Motion").

Ms. Miller wishes to proceed in state court to enforce her rights under a marital settlement agreement.  In the Motion, she asserts that the automatic stay is inapplicable by virtue of 11 U.S.C. §362(b)(2).  In the alternative, she seeks relief from the stay pursuant to §362(d).

-1-

The Debtor filed a response to the Motion on October 21, 2013.  A hearing on the Motion was held and concluded on October 31, 2013.

At the hearing, neither party called any witnesses.  Instead, they introduced into evidence certain documents in support of their respective positions:

> (1) the parties' marital settlement agreement ("the MSA");
>
> (2) three (3) motions filed by Ms. Miller and three (3) orders entered in the parties' divorce proceedings in the Court of Common Pleas, Montgomery County, PA ("the State Court");
>
> (3) the Debtor's Schedules A, B and C and chapter 13 plan filed in this court; and
>
> (4) a Single Premium Structured Settlement Annuity Contract, which lists the Debtor as the payee.

The parties filed post-hearing memoranda on November 7, 2013 and the matter is ready for decision.

For the reasons explained below, I conclude that Ms. Miller has not invoked any provision of the Bankruptcy Code that would justify a determination that the automatic stay does not apply to the collection actions she wishes to pursue in the State Court.  See 11 U.S.C. §362(b)(2).  However, I also conclude that she has established that cause exists to grant her relief from the automatic stay pursuant to 11 U.S.C. §362(d) to pursue most, but not all, of the remedies available to her for enforcement of the MSA in the State Court.

## II. FACTS

### A. The Marital Settlement Agreement (the MSA)

The Debtor and Ms. Miller were married in 1990. They had three children, born in 1991, 1993 and 1994. The parties separated in 2005. They entered into the MSA on September 11, 2009. They were divorced by decree entered July 20, 2010.

The recital to the MSA states that the agreement was intended to adjust and resolve all matters relating to: the parties' ownership of real and personal property; past, present and future support and alimony; and all possible claims between them.

The MSA provided, <u>inter alia</u>:

- in a section titled "<u>Child Support</u>," for:

    - the Debtor to pay Ms. Miller $680.00 per month in support of the parties' then two (2) minor children, with the first payment being deferred until the month following the sale of the marital residence with the payments continuing until a child reaches the age of 18 and has completed high school (whichever is later);[1]

    - the calculation of the support obligation to be "revisit[ed]" in the event of a significant change in the parties' earnings;

    - Ms. Miller to pay the first $250.00 in the children's medical expenses each year, after which the Debtor is to pay 40% of the expenses;

    - the Debtor to provide medical insurance for the children so long as it is available under his existing disability benefit;

    - the parties to divide equally extracurricular and camp expenses for the children, provided they agree after consultation;

---

[1]      The MSA provides for early termination of this obligation if the child discontinues high school or no longer resides permanently with Ms. Miller.

- in a separate section titled, "College Education," for

  - Ms. Miller to pay 60% and the Debtor to pay 40% of college tuition (after deduction for financial aid) at Montgomery County Community College for the eldest son Calvin ("Calvin");

  - the Debtor to pay, in addition, $8,000.00 toward the tuition, that amount representing the amount of money the Debtor borrowed from an account in Calvin's name to purchase an automobile for the Debtor's own use;

- in a section titled "Real Estate," for

  - the marital residence ("the Residence") to be placed on the market for sale no later than January 2, 2010, prior to which the Debtor would move into the Residence and Ms. Miller would reside elsewhere;

  - the Debtor to pay all of the expenses for the Residence after September 2009, pending its sale;

  - the sale price to be agreed by the parties or, if they are unable to agree, by a real estate broker and thereafter, with the price thereafter to be lowered by up to 30% absent further agreement or order of court;

  - division of the net proceeds equally;

- in a section titled Alimony, Alimony Pendente Lite and/or Spousal Support, that the parties waived their right to alimony, alimony pendente lite and/or spousal support and that the "clause is not modifiable;"[2]

---

[2]    There were several other provisions of the MSA addressing economic issues that are less material to the present dispute:

- in a several separate sections, that they had no retirement funds, pensions or stock options, judgments or joint accounts subject to equitable distribution;

- in a section titled "Non-Marital Accounts," that two (2) accounts in the Debtor's name (totaling $303.00) and three (3) accounts in Ms. Miller's name (totaling $18,493.00) would be treated as non-marital, post-separation accounts not subject to equitable distribution;

- in a section titled "Marital Debt," that Ms. Miller would assume the balance of the marital debt on one card (Discover) ($8,000.00) and that the four (4)

(continued...)

•   in a provision titled "<u>Bankruptcy</u>," that

>    (a) the debtor spouse waives any right to claim any exemption to any
>    property and "assigns . . . to the creditor-spouse an interest in all of the
>    debtor's exempt property sufficient to meet all obligations  . . .  set
>    forth [in the Agreement]; and

>    (b) "[n]o obligation created by this Agreement shall be discharged or
>    dischargeable, regardless of federal or state law to the contrary, and
>    each party waives any and all right to assert that any obligation
>    hereunder is discharged or dischargeable."[3]

(Ex. M-1).


### B.  The Pre-Petition State Court Proceedings

On January 17, 2012, Ms. Miller filed a Petition for Contempt and to Enforce Marital

Settlement Agreement in the State Court ("the Contempt Petition").  (Ex. M-2).  In the Contempt

Petition, Ms. Miller alleged that the Debtor failed to list the Residence for sale and to cooperate

in the sale process and failed to pay various financial obligations under the MSA including: child

support, medical expenses, education expenses, the $8,000 he borrowed from Calvin's bank

account, mortgage and tax obligations on the Residence.  (<u>Id.</u>).

-----

[2](...continued)

cards in the Debtor's name (totaling $4,126.00) would be treated as
non-marital debt.


[3]    I note, right up front, that the provision of the MSA providing for a contractual waiver of
the Debtor's right to discharge any obligation under the MSA that might otherwise be dischargeable in
bankruptcy is unenforceable.  The Bankruptcy Code prohibits such a pre-petition waiver.  <u>See</u> 11 U.S.C.
§524(a)(1) and (2) (subsections of §524(a) describing effect of a discharge "whether or not discharge of
such debt is waived"); <u>see generally</u> <u>In re Gurrola</u>, 328 B.R. 158, 163 (B.A.P. 9th Cir. 2005) (stating, in
context of post-discharge conduct asserted to give rise to estoppel that "the present version of the federal
bankruptcy discharge provides an absolute, nonwaivable defense").

By order dated January 9, 2013, the State Court granted the Contempt Petition.  The court ordered the Debtor to, inter alia:

- maintain the sale listing of the Residence and cooperate in the sale process;

- timely pay the mortgage and real estate tax obligations on the Residence;

- pay ongoing child support on a timely basis.

- pay past due child support of $18,360.00 within sixty (60) days;

- pay Calvin $8,000.00, plus interest, within thirty (30) days;

- pay Ms. Miller $3,500.00 on account of her attorney's fees, within thirty (30) days.

(Ex. M-3).

In the January 9, 2013 order, the State Court also stated that "any decrease in the value of the marital residence" due to the Debtor's failure to list it "shall be addressed at the time of equitable distribution."  (Id.).  By Amended Order dated January 30, 2013, the State Court clarified any ambiguity in its prior order by providing that:

> upon the sale of [the Residence], counsel may petition or apply to the Court to determine the value of the residence thereby preserving the issue of division of equity in the home's proceeds.  A hearing on this issue will be scheduled if necessary.

(Id.).

On or about April 13, 2013, Ms. Miller filed an Amended Petition for Contempt ("the Amended Contempt Petition"), alleging that the Debtor failed to comply with the State Court's January 30, 2013 order.  (Ex. M-4).  In her request for relief, Ms. Miller requested that the Debtor be ordered to:

(1) take certain actions designed to facilitate the sale of the Residence and

-6-

preserve the value of Ms. Miller's equitable distribution interest in the
property (e.g., keep it in good condition, pay ongoing and delinquent mortgage
payments);

(2)  pay ongoing child support, "to be enforced through the Montgomery County
Domestic Relations Office";

(3)  pay all past due child support ($18,360.00) forthwith;

(4)  pay Calvin Miller $8,000.00 forthwith;

(5)  pay Ms. Miller's attorney's fees of $3,500.00.

(Id.).[4]

On June 4, 2013, Ms. Miller filed a Second Petition for Contempt ("the Second Contempt

Petition"), reasserting many of the same claims as alleged in the Amended Contempt Petition.

(Ex. M-5).  On August 1, 2013, the State Court scheduled a hearing on the Second Contempt

Petition for November 18, 2013.  (Ex. M-6).


### C. The Debtor's Bankruptcy Filing

The Debtor filed a chapter 13 bankruptcy petition on July 15, 2013.  He filed his

bankruptcy schedules and chapter 13 plan on August 8, 2013.

In Schedule A, the Debtor listed the Residence as his sole real property.  Schedule A

states that the property's value is $385,000.00 ($425,000.00 fair market value minus $40,000.00

---

[4]  Ms. Miller also requested that she be permitted to seek relief in the State Court to compel
Debtor to provide her with "all mortgage interest tax deduction and property tax information necessary
for [Ms. Miller] to file tax returns."  Based on the fundamental principle that the bankruptcy court
"should not interfere with domestic relations disputes that do not have an adverse impact on the
bankruptcy case," In re Dreier, 438 B.R. 449, 455 (Bankr. S.D.N.Y. 2010) (quoting 3 Collier on
Bankruptcy ¶362.05[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013)), I will grant Ms.
Miller relief for this purpose.

for repairs), subject to secured claims of $387,751.64.  (Ex. M-7).

In Schedules B and C, the Debtor disclosed ownership of and claimed exemptions in a modest amount of cash, bank accounts and personal property (totaling less than $7,000.00 and a 2008 Subaru automobile with a value of less than $16,000.00 (encumbered by a $3,200.00 lien). He also disclosed his interest in a Genworth Annuity ('the Annuity'), which he described as payable at $2,344.44 per month, guaranteed until Jan. 2020.[5]   He claimed the Annuity as exempt under 11 U.S.C. §522(d)(10)(E), 11 U.S.C. §522(d)(11)(D) and §522(d)(11)(E).  (Ex. M-7).

The docket reflects that the §341 hearing (meeting of creditors) initially was scheduled to be held on October 23, 2013.  (Doc. # 18).  It has been continued to November 20, 2013.  (See Docket Entry No.  # 42).

The Debtor's proposed chapter 13 plan ("the Plan") provides for the property secured by the Residence to be sold and for the Debtor to pay the chapter 13 trustee $25,773.00 in sixty (60) monthly payments of $429.55.[6]  (Ex. D-2).  From the plan payments paid to the trustee, the Plan

---

[5]      According to the Annuity contract introduced into evidence, (Ex. D-1), the owner of the Contract No. K3835420 is GE Capital Assignment Corp and the Debtor is both the annuitant and the payee.  The benefit amount of the annuity ("the Annuity") is $1,923.25 monthly beginning February 1, 2000 and ending January 1, 2020, with the payments increasing annually at a compound rate of two percent (2%).  The monthly benefit is presently greater than it was in the year 2000.

[6]      Based on the Debtor's bankruptcy schedules, it is not clear how the Debtor can afford the proposed plan payment.

In his Schedule I, the Debtor disclosed average monthly income of $4,746.63 (consisting of $610.44 net pay as a car wash attendant; $1,621.00 in Social Security benefits; $2,487.94 from his annuity; and $27.25 representing the monthly pro-ration of expected tax refund).  (See Doc. #15).

In Schedule J, the Debtor disclosed average monthly expenses of $6,797.41, an amount far in excess of his monthly income.  The shortfall between disclosed income and expenses is $2,050.78, even before considering the proposed plan payment of $429.55.  (See id.).

(continued...)

provides for payment of:

- administrative expenses (which the Plan defines as including the chapter 13 trustee's commission[7] and the Debtor's counsel fee of $2,500.00;

- priority claims;

- a pro rata distribution to general unsecured creditors.[8]

On September 16, 2013, approximately five (5) weeks after filing the Plan, the Debtor filed a motion seeking leave to sell the Residence ("the Sale Motion").  (Doc. # 24).  At the hearing on the Sale Motion held on October 15, 2013, Ms. Miller's counsel appeared.  The parties agreed that the sale price ($418,000) fell slightly short of the amount necessary to satisfy the first mortgage and all closing costs (primarily, transfer taxes and broker's commission) and that the sellers (the Debtor and Ms. Miller) would have to pay approximately $4,000.00 to close the transaction.  Both parties supported the Sale Motion and it was granted by the court.

---

[6](...continued)
The Debtor's disclosed monthly expenses includes $2,634.10 for the monthly mortgage payment on the Residence.  Presumably, the Debtor's housing expenses will decrease, but it would seem unlikely that the Debtor's housing expense will decrease enough to make up his budget shortfall of almost $2,500.00.

[7]    The Debtor's premise that the chapter 13 trustee's statutory commission under 28 U.S.C. §586(e) is an administrative expense under 11 U.S.C. §507(a)(2) may not be correct.  See, e.g., In re Miranda, 285 B.R. 344, 2001 WL 1538003 at *2 (B.A.P. 10th Cir. Dec. 4, 2001) (nonprecedential); In re Acevedo, 497 B.R. 112 (Bankr. D.N.M. 2013).  But see In re Barrera, 1999 WL 33486717, at *1 (Bankr. D. Idaho May 7, 1999).

[8]    The Plan also provides for the Debtor to pay current payments to the lender secured by his 2008 Subaru automobile "outside the plan."

# III.  STATUTORY FRAMEWORK

In analyzing Ms. Miller's Motion and the Debtor's opposition, it is helpful to begin with an overview of two (2) subjects addressed in the Bankruptcy Code and Federal Rules of Bankruptcy Procedure, before delving into the details and nuances of the automatic stay provisions invoked by Ms. Miller in the Motion.  The two (2) subject areas are: (1) dischargeability; and  (2) property of the estate and exemptions.

## A.  Dischargeability

A debt that is in the nature of alimony, maintenance or support of a spouse, former spouse or child of the debtor (now defined by the term "domestic support obligation"  – often shortened to "DSO")[9] is not dischargeable in either a chapter 7 or chapter 13 bankruptcy case.  See 11

---

[9]    11 U.S.C. §101(14A) defines the term "domestic support obligation" ("DSO") as including any debt arising before, on, or after the entry of an order for relief

>    (A)   owed to or recoverable by  —
>
>>        (i)   a **spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative**; or
>>
>>        (ii)  a governmental unit;
>
>    (B)   **in the nature of alimony, maintenance, or support** (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;
>
>    (C)   **established or subject to establishment** before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of —
>
>>        (i)    **a separation agreement, divorce decree, or property settlement** agreement;

(continued...)

-10-

U.S.C. §§523(a)(5); 1328(a)(2).  A debt owed to a spouse, former spouse or child of the debtor,

**that is not a DSO**, but that is incurred "in the course of a divorce or separation or in connection

with a separation agreement, divorce decree or other order of a court of record" is

nondischargeable in a chapter 7 case.  See 11 U.S.C. §523(a)(15).  However, a non-DSO marital

obligation encompassed by 11 U.S.C. §523(a)(15) is dischargeable in a chapter 13 case.  See 11

U.S.C. §1328(a)(2) (incorporating by reference certain chapter 7 nondischargeability provisions,

but excluding §523(a)(15)); see also Steele v. Heard, 487 B.R. 302, 308 & n.9 (S.D. Ala. 2013)

(citing cases).

The characterization of a debt as a DSO or a non-DSO marital obligation is a question of

federal bankruptcy law.  See In re Gianakas, 917 F.2d 759, 762 (3d Cir. 1990).  Generally

speaking, when an obligation is derived from a marital settlement agreement entered into by the

parties, determining whether the obligation is in the nature of alimony, maintenance or support,

as distinguished from a property settlement, depends on the intent of the parties at the time of the

---

[9](...continued)

      (ii)  **an order of a court of record**; or

      (iii) a determination made in accordance with applicable
           nonbankruptcy law by a governmental unit; and

    (D)  not assigned to a nongovernmental entity, unless that obligation is assigned
         voluntarily by the spouse, former spouse, child of the debtor, or such
         child's parent, legal guardian, or responsible relative for the purpose of
         collecting the debt.

(emphasis added).

settlement agreement.  Id. at 763.[10]

## B.  Property of the Bankruptcy Estate and Exemptions

Next, are the provisions relating to property of the bankruptcy estate.

Section 541 of the Bankruptcy Code broadly defines property of the estate as "all legal

and equitable interests of the debtor in property as of the commencement of the case," 11 U.S.C.

§541(a)(1), but specifically excludes "earnings from services performed by an individual debtor

after the commencement of the case," 11 U.S.C. §541(a)(6).  In a chapter 13 case, §541(a) is

supplemented by §1306(a), which expands the scope of the bankruptcy estate in two (2)

significant ways.  First, the temporal restriction, "as of the commencement of the case," does not

exist; all property of the kind specified in §541 acquired by a chapter 13 debtor post-petition is

property of the bankruptcy estate.  Second, the debtor's post-petition earnings derived from

personal services (excluded from the general definition of estate property by § 541(a)(6)), also

are included as property of the estate.  See 11 U.S.C. §1306(a).

11 U.S.C. §522(b)(1) provides that "[n]othwithstanding §541, an individual debtor may

---

[10]      Prior to the 2005 amendments to the Bankruptcy Code, the distinction between marital
obligations that are in the nature of support and those that are not (typically, debts in the nature of the
equitable distribution of marital property) also was significant in determining dischargeability in chapter
7 cases.  Simply put, in chapter 7 cases, a support obligation was nondischargeable while the
dischargeability of §523(a)(15) non-support debt incurred in the course of a divorce or marital separation
was determined by a statutory "balancing test."  4 Collier on Bankruptcy ¶523.23 (Alan N. Resnick,
Henry J. Sommer eds., 16th ed. 2013) ("Collier").  That is no longer the case.  However, "the distinction
between marital support obligations covered by § 523(a)(5) and debts incurred during a divorce other
than such support obligations remains significant for chapter 13 debtors."  In re Yelverton, 2012 WL
4434087, at *7 n.6 (Bankr. D.D.C. Sept. 24, 2012); 4 Collier ¶523.11[1].  Therefore, the cases decided
before the 2005 amendments, distinguishing obligations that are in the nature support from those that are
not, retain precedential value.

exempt" certain property from the bankruptcy estate.  The available exemptions are identified in

§522(b)(2) and (b)(3).  "The consequence of the assertion of valid exemption is that an individual

debtor's exempt property is not liquidated in a chapter 7 case and is not included in the

calculation of the amount unsecured creditors are entitled to receive in distribution in a chapter

13 case under 11 U.S.C. §1325(a)(4)."  In re Funches, 381 B.R. 471, 491 (Bankr. E.D. Pa. 2008).

The mechanism for claiming exemptions is provided by 11 U.S.C. §522(l), which

requires that the debtor file a list of property claimed as exempt under §522(b).  Section 522(l)

also states: "Unless a party in interest objects, the property claimed as exempt on such list is

exempt."  Fed. R. Bankr. P. 4003(b)(1) provides that a party in interest may file an objection to

the debtor's claimed property exemptions "within 30 days after the meeting of creditors held

under § 341(a) is concluded or within 30 days after any amendment to the list or supplemental

schedules is filed, whichever is later."[11]

Based on §522(l) and Rule 4003(b)(1), courts have held that a claimed exemption of

property from the bankruptcy estate "becomes effective" when the deadline for objection under

Rule 4003(b)(1) has expired and no objections have been filed.  See In re Edmonston, 107 F.3d

74, 76 (1st Cir. 1997); Wilborn v. Dun & Bradstreet Corp., 180 F.R.D. 347, 352 (N.D. Ill. 1998);

In re Hines, 2008 WL 2783351, at *2 (Bankr. M.D.N.C. July 15, 2008); In re Bullard, 358 B.R.

541, 542 n.4 (Bankr. D. Conn. 2007); In re Beshirs, 236 B.R. 42, 44 (Bankr. D. Kan. 1999).

Property exempted during the bankruptcy case "is not liable during or after the case for"

pre-petition debts.  11 U.S.C. §522(c).  This protected status afforded to exempt property applies

---

[11]     In certain circumstances, not relevant here, objections to exemptions may be filed after
the 30 day period provided in Rule 4003(b)(1).  See Fed. R. Bankr. P. 4003(b)(2), (3).

-13-

even if a debt is nondischargeable.  See In re Vaughan, 311 B.R. 573, 579 (B.A.P. 10th Cir.

2004); In re Farr, 278 B.R. 171, 177 (B.A.P. 9th Cir. 2002); see also In re Aloia, 496 B.R. 366,

378 (Bankr. E.D. Pa. 2013) (citing §522(c) for the proposition that a creditor holding a

nondischargeable claim "free to exercise its state law rights to recover its claim **from**

**non-exempt property**") (emphasis added).  However, §522(c) includes several exceptions to this

protection of exempt property, including an exception for DSO's.  See 11 U.S.C. §522(c)(1).

Thus, a DSO not only is nondischargeable in a chapter 13 case, but after the conclusion of

the bankruptcy case, the holder of a DSO claim may attempt to collect on the DSO by proceeding

against property that the debtor claimed as exempt during the bankruptcy case.  See, e.g., In re

Rouse, 145 B.R. 546, 549 (Bankr. W.D. Mich. 1992).

### C.  The Automatic Stay

#### 1.

The automatic stay, 11 U.S.C. §362(a), is

> one of the fundamental debtor protections provided by the bankruptcy laws. It
> gives the debtor a breathing spell from his creditors. It stops all collection efforts,
> all harassment, and all foreclosure actions. It permits the debtor to attempt a
> repayment or reorganization plan, or simply to be relieved of the financial
> pressures that drove him into bankruptcy. The automatic stay also provides
> creditor protection. Without it, certain creditors would be able to pursue their own
> remedies against the debtor's property.

In re Krystal Cadillac Oldsmobile GMC Truck, Inc., 142 F.3d 631, 637 (3d Cir. 1998) (citing

H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 340 (1977), U.S. Code Cong. & Admin. News 1978,

pp. 5963, 6296, 6297); accord Constitution Bank v. Tubbs, 68 F.3d 685, 691 (3d Cir. 1995).

The automatic stay "restrains a broad range of conduct, including the continuation of

litigation, the enforcement of pre-petition  judgments, the creation or enforcement of liens against

property of the estate and, most broadly, any act to collect, assess, or recover a claim against the

debtor which arose prepetition."  In re Allentown Ambassadors, Inc., 361 B.R. 422, 435 (Bankr.

E.D. Pa. 2007) (quotations and footnotes omitted).

11 U.S.C. §362(b) contains twenty-six (26) exceptions to the automatic stay.  One of

those subsections, §362(b)(2), to be analyzed further below, concerns debts arising out of marital

and parental relationships.

11 U.S.C. §362(d) authorizes the court to grant relief from the automatic stay, in the form

of an order "terminating, annulling, modifying or conditioning" the automatic stay, for "cause."

11 U.S.C. §362(d).  With respect to requests for relief from the stay made by an unsecured

creditor:

> The grant of such relief is relatively rare because it usually would contravene the
> purposes of the automatic stay.  Nevertheless, in some cases, the hardship to the
> movant as compared to the hardship to the debtor may justify granting stay relief.
> Or, analyzed slightly differently, the equities of freeing the creditor from the
> restraint of the automatic stay may outweigh the potential negative impact that
> such relief would have on the bankruptcy process.   In making these
> determinations, the bankruptcy court must consider the "totality of the
> circumstances," and is accorded considerable discretion in evaluating the
> competing interests.

In re Bell, 476 B.R. 168, 179 (Bankr. E.D. Pa. 2012) (citations omitted).

Under §362(d), the party seeking relief from the stay has an initial burden to demonstrate

cause for relief.  E.g., In re Ward, 837 F.2d 124, 128 (3d Cir. 1988).  The ultimate burden of

persuasion is governed by §362(g), which provides that in any hearing under §362(d):

> (1) the party requesting such relief has the burden of proof on the issue of the
>     debtor's equity in property; and

(2) the party opposing such relief has the burden of proof on all other issues.

Thus, in this contested matter, if Ms. Miller meets her burden of production, the burden of proof

rests with the Debtor.

## 2.

On its face, at least two (2), and possibly three (3), subparagraphs of the automatic stay,

11 U.S.C. §362(a)(1), (a)(2) and (a)(3), restrain a marital creditor from proceeding in state court

to enforce a bankruptcy debtor's financial obligations under a marital settlement agreement.[12]

However, Ms. Miller's lead request is for a determination that an exception to the automatic stay

permits her to proceed unimpeded in state court to enforce her claims against the Debtor.  It is

therefore, appropriate to examine more closely the provision that excepts certain domestic

relations proceedings from the automatic stay, 11 U.S.C. §362(b)(2).

Section 362(b)(2) provides, in pertinent part, that a bankruptcy filing does not operate as

a stay:

> (2) under subsection (a) —

---

[12]    Section 362(a) provides that the automatic stay restrains, inter alia:

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>
> (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;
>
> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.

-16-

(A) of the commencement or continuation of a civil action or proceeding—

    (ii)   for the **establishment or modification** of an order for domestic support obligations  . . .

    (iv)   for the dissolution of a marriage, **except to the extent that such proceeding seeks to determine the division of property** that is property of the estate; or  . . .

(B) of the **collection of a domestic support obligation** from property that is not property of the estate;

(C) with respect to the **withholding of income that is property of the estate or property of the debtor** for payment of a domestic support obligation under a judicial or administrative order or a statute  . . . .

11 U.S.C. §362(b) (emphasis added).

Under subparagraph (A), determinations regarding the existence and amount of a DSO are not subject to the stay.  Under subparagraph (B), the actual collection of a DSO is not stayed, but there is an important qualification.  Collection is not stayed only if the DSO is collected from a source other than property of the bankruptcy estate.  Under subparagraph (C), the "withholding of income that is property of the estate or property of the debtor" for payment of a [DSO] "under a judicial or administrative order or a statute" is not subject to the automatic stay.  When applicable, this "withholding of income" exception, is broader than §362(b)(2)(B) in that the exception to the automatic stay allows for the withholding of income that is property of the estate and therefore, includes  post-petition property (including  post-petition earnings) acquired by a debtor after the filing of a chapter 13 case.  See 11 U.S.C. §1306(a).

**3.**

Under the plain language of §362(b)(2)(A) and (B), the three (3) questions that must be

resolved in order to determine whether a particular ongoing state court proceeding involving the

collection of money or property from the debtor[13] is excepted from the automatic stay, are:

> (1) Is the debt a DSO ?
>
> (2) If the debt is a DSO, is the moving party seeking an order in state court that merely establishes or modifies the DSO?
>
> (3) If the moving party is seeking more than a state court order establishing or modifying the DSO – i.e., an order enforcing the payment of a DSO – is the party seeking payment from sources other than property of the bankruptcy estate?

If the answers to the first two (2) questions are "yes," based on subparagraph (A),  the

stay does not apply to the pending state court proceeding insofar as the marital creditor is seeking

the establishment or modification of an order.

If the answer to the first question is "yes" and the second question is "no," the answer to

the third question must be "yes," in order for the moving party to proceed in state court

unimpeded by the automatic stay pursuant to subparagraph (C).  Otherwise, the exception to the

automatic stay is inapplicable.

11 U.S.C. §362(b)(2)(C), was enacted as part of the 2005 amendments.[14]  Its significance

lies largely in its expansion of subparagraph (B), i.e., its authorization of a "withholding of

---

[13]     Proceedings to establish paternity, child custody and the dissolution of the marriage relationship, or regarding domestic violence, are categorically and unqualifiedly excepted from the automatic stay.  See 11 U.S.C. §362(b)(2)(A)(i), (iii), (iv) and (v).

[14]     See Pub. L. No. 109–8, §214 , 119 Stat. 23 (2005) (effective October 17, 2005).

income **that is property of the estate**" for payment of a DSO. (emphasis added). However, I

will not further analyze §362(b)(2)(C) because, as explained below in Part IV., Ms. Miller has

not invoked this subsection and has requested only that the bankruptcy court permit her to

proceed against assets which are not property of the estate.[15]

## IV.  THE PARTIES' CONTENTIONS

The parties agree that, in order to evaluate the scope of the automatic stay and the

propriety of granting relief from the stay, it is necessary to determine whether the debts at issue

are DSO's. That is where their agreement ends.

Ms. Miller's position is straightforward. She contends that the debts she seeks to collect

are in the nature of alimony or support and therefore, are DSO's. From that starting point, she

asserts that:

> In view of the domestic, non-commercial origin of these obligations, their
> nondischargeability [under 11 U.S.C. §523(a)(5)] and the potential needs of the
> obligees, there is a strong reason to permit collection of these obligations free
> from the restrictions of the automatic stay, as long as the collection is not from

---

[15]        There is, some division among the courts regarding the scope of the§362(b)(2)(C)
exception to the automatic stay. Some courts construe the exception broadly to liberate from the
automatic stay virtually any creditor action to enforce a DSO, even from property of the estate, on the
theory that the authority to "withhold income" from property of the estate includes the authority to
effectuate the withholding through contempt remedies and sanctions. See, e.g., In re Friedberg, 2009 WL
1292273, at *1 (Bankr. D. Conn. May 8, 2009); see also In re Lawida, 2011 WL 4502060, at *1 (B.A.P.
9th Cir. Aug. 1, 2011) (nonprecedential) (describing unreported bankruptcy court decision under review
as holding that  contempt proceeding seeking all sanctions, including incarceration, a money judgment
and attorney's fees was excepted from the automatic stay by §362(b)(2)(C)). Other courts have
construed §362(b)(2)(C) more narrowly, limiting the exception to actions to withhold income in order to
collect on a DSO obligation. See In re DeSouza, 493 B.R. 669, 673-74 (B.A.P. 1st Cir. 2013); Lawida,
2011 WL 4502060, at *6-7.

        It is unnecessary to consider these issues in this case.

property of the estate.

(Ms. Miller's Brief at 6).

Significantly, the Debtor acknowledges the qualifier "as long as the collection is not from property of the estate."  See 11 U.S.C. §362(b)(2)(B).  Nevertheless, she asks that the court determine that, in enforcing her rights under the DSO, she may proceed against the Debtor's Annuity because the Debtor has exempted it in Schedule C pursuant to 11 U.S.C. §522(d).  Ms. Miller does not cite to 11 U.S.C. §362(b)(2)C) or make the argument that her efforts to reach the Annuity through the Second Contempt Petition are excepted from the stay by that subsection. Therefore, I do not consider that issue.  See generally n.15, supra.

In response, the Debtor disputes that the obligations are DSO's, emphasizing that the determination whether an obligation is a DSO should be made by the bankruptcy court, not the State Court.  To the extent that the debts may be DSO's, the Debtor argues that all of the assets subject to collection through the Second Contempt Petition are estate assets that remain subject to the automatic stay under §362(b)(2)(B).  The Debtor further emphasizes that any DSO debts are provided for in full in his chapter 13 plan.  As a result, he posits that, not only are there no applicable exceptions to the automatic stay, but also that cause does not exist for granting relief from the stay.


# V.  ANALYSIS

The best method for resolving issues relating to the scope of the automatic stay with respect to marital debts is to focus on two (2) questions.  What is the nature of rights the non-debtor seeks to enforce and what remedies does the non-debtor intend to seek in the

-20-

nonbankruptcy forum?  Once those questions are answered, the bankruptcy court can determine

whether any of the exceptions to the automatic stay apply under §362(b)(2) and, if not, whether

cause exists for granting relief from the stay under §362(d).

### A.  Sale of the Residence

The root cause of the dispute between the parties is the Debtor's failure to effect a sale of

the Residence in a timely fashion after the parties entered into the MSA in September 2009.  In

all of her Contempt Petitions, Ms. Miller asserted that the Debtor breached the MSA by failing to

move the property to sale.

This specific part of the parties' dispute appears to be largely resolved.  The Debtor filed

the Sale Motion and the Sale Motion has already been granted in this court.[16]

The sale of the Residence, provided for in the MSA, has all of the earmarks of a division

of marital property, rather than a DSO.  Insofar as Ms. Miller did not address the Residence in

her post-hearing brief, I doubt that she contends otherwise.  Thus, to the extent that Ms. Miller

still wishes to proceed in the State Court to enforce the Debtor's obligation to cooperate in the

sale of the Residence, that obligation does not fall within 11 U.S.C. §362(b)(2)(B).  And, even if

it could be characterized as a DSO, the property involved (the Residence) is property of the

---

[16]    The record does not reveal whether closing has since occurred.  The closing date set
forth in the agreement of sale attached to the Sale Motion was September 9, 2013.  Presumably, at or
around that time, the parties agreed to an extension of time.  I do not recall the parties mentioning the
extended closing date during the October 31, 2013 hearing on the Motion sub judice.

Upon closing, no issues will arise regarding division of the net proceeds as there will be
no net proceeds. See Part II.C., supra.

estate.

The only other avenue for relief available to Ms. Miller is 11 U.S.C. §362(d).  I conclude that cause under §362(d) does not exist at this time.  Considering the terms of the Debtor's chapter 13 plan, more significantly, his prompt post-petition implementation of the Plan, and the grant of the Sale Motion, relief from the automatic stay appears unnecessary.


### B.  The Obligation Labeled as "Child Support" in Paragraph 4 of the MSA

### 1.

Ms. Miller wishes to return to the State Court to seek enforcement of the ongoing obligation labeled as "child support" in Paragraph 4 of the MSA and the $18,360.00 of that obligation determined to be in arrears by the State Court in granting her initial Contempt Petition. (Ex. M-3).  This is the crux of the parties' dispute.

The Debtor denies that this obligation is a DSO.  He bases his position on a somewhat unusual provision in the MSA.  After setting the level of child support at $680.00 per month, Paragraph 4 of the MSA provides:

> Payments will be made by the first day of each month.  Husband's payment obligation will commence on the first day of the first full month following execution of this agreement.  **However, Wife has agreed to defer the initiation date of Husband's payment obligation until the first day of the first full month following the sale of the marital residence**.

(emphasis added).

Based on the second sentence in the passage quoted above, the Debtor argues that "[t]he $680.00 monthly payments are not in the nature of support because that obligation is expressly tied to the sale of the marital residence such that [the] $680.00 monthly payments are an

additional measure of equitably distributing the proceeds from the sale of the marital property."

(Debtors's Brief at 13).[17]


**2.**

In <u>Gianakas</u>, the Court of Appeals provided clear guidance regarding the methodology

that bankruptcy courts should employ in determining whether a marital obligation is in the nature

of support.  The court instructed:

> First, the court must examine the language and substance of the agreement in
> the context of surrounding circumstances, using extrinsic evidence if necessary.
> However, it is likely that neither the parties nor the divorce court contemplated the
> effect of a subsequent bankruptcy when the obligation arose. Therefore, the
> parties and the state courts may not have focused on whether a particular
> obligation was to serve as support or as a property settlement unrelated to support.
> . . .  In fact, property division often achieves the same goal as alimony, <u>i.e.,</u>
> support.
>
> Because the language of the agreement alone may not provide a sufficiently
> conclusive answer as to the nature of an obligation, the second indicator to which
> we must look to assist in ascertaining the parties' intent is the parties' financial
> circumstances at the time of the settlement. The facts that one spouse had custody
> of minor children, was not employed, or was employed in a less remunerative
> position than the other spouse are aspects of the parties' financial circumstances at
> the time the obligation was fixed which shed light on the inquiry into the nature of
> the obligation as support.

---

[17]        In his post-hearing submission, the Debtor does not suggest that he owes nothing under
the literal terms of Paragraph 4 of the MSA (because the Residence has not been sold).  Instead, he
asserts (without any evidentiary support in the record in this court):

> [Al]though the issue is not presently before the Court, Debtor has made
> approximately $10,000.00 in payments to Movant and their children such that
> the amount of Movant's claim is in dispute and Debtor will be objecting to
> Movant's claim within this bankruptcy.

(<u>Id.</u> at 14).

> Third, the court should examine the function served by the obligation at the time of the divorce or settlement. An obligation that serves to maintain daily necessities such as food, housing and transportation is indicative of a debt intended to be in the nature of support.

Gianakas, 917 F.2d at 762-63 (quotations and citations omitted).

A leading treatise breaks out the three (3) Gianakas factors into a more expansive set of factors for a court to consider in distinguishing DSO's from property division obligations:

(1)  the labels in the agreement or court order;

(2)  the income and needs of the parties at the time the obligation became fixed;

(3)  the amount and outcome of property division;

(4)  whether the obligation terminates on obligee's death or remarriage or on emancipation of children;

(5)  number and frequency of payments;

(6)  waiver of alimony or support rights in agreement;

(7)  availability of state court procedures to modify or enforce obligation through contempt remedy;

(8)  tax treatment of obligation.

4 Collier ¶523.11[6][a]-[h].

**3.**

As the Gianakas court stated, the issue presented requires a determination of the parties' intent in entering the MSA, making this federal question largely one of contract interpretation. Neither party having presented any testimonial evidence, I am left to make inferences primarily from the four (4) corners of the MSA itself.

The most compelling indication of the purpose and nature of the ongoing $680.00 per month obligation is the label given to it in the MSA.  Significantly, the accuracy of the characterization in the MSA is vigorously reinforced by the fact that the obligation terminates when either a child reaches the age of 18, leaves high school or leaves Ms. Miller's residence  – very strong indicators that it is in the nature of support.

As stated above, the Debtor argues that the "deferral" provision demonstrates that the obligation was in the nature of a property settlement.  (See Debtor's Brief at 13).

To the extent that deferral of the payment obligation pending the sale of the Residence creates some ambiguity regarding the nature of the obligation, based on the current record, I am not persuaded that the stream of payments mandated by Paragraph 4 of the MSA was a division of marital property.  Respectfully, I fail to see the connection between the proceeds of the sale of the Residence and the $680.00 monthly payment obligation posited by the Debtor.  If, as the parties presumably hoped and expected, the prompt sale of the Residence resulted in net proceeds available for equitable division, Paragraph 1 of the MSA already provided for that division (52/48% in favor of the Debtor).  Thus, the $680.00 per month obligation can be seen only as a separate obligation, not linked in any way to the equitable division of the value of the Residence.

What purpose then, did the deferral provision serve?  The inference I draw from the content of the MSA is that the parties contemplated a prompt sale of the Residence.  Ms. Miller recognized that, during the anticipated short interval prior to sale, the Debtor would have difficulty paying the monthly support obligation while also maintaining the mortgage payments and upkeep on the property.  Thus, it would appear that the deferral of the monthly support payment was intended to be a short-term measure, designed to facilitate the sale and maximize

the net proceeds from the sale of the Residence.  For reasons not in the record, four (4) years passed after the execution of the MSA and the Residence has not been sold.  The State Court appears to have found the Debtor culpable for this delay and (perhaps also concluding that Ms. Miller lost her share of the equity in the Residence during the delay) and determined that the appropriate remedy was to treat the support obligation as being in effect prior to the sale of the property.[18]

The Debtor makes one (1) other argument in support of his position that the $680.00 per month obligation is not a DSO.  The Debtor correctly points out that <u>Gianakas</u> instructs that one (1) of the factors to be considered is the parties' financial circumstances at the time of the settlement.  He states: "At the time of the divorce, Movant was the primary earner for the family and, in large part due to the injuries sustained by Debtor, was the primary support for the children."  (Debtor's Brief at 14).  Perhaps recognizing that the record regarding this assertion regarding the relative financial condition of the parties at the time of the MSA was not developed at the hearing, the Debtor contends in his post-hearing brief that his dependency and Ms. Miller's "much greater future earning capacity" can be "derived from the Marital Settlement Agreement and the limited nature of Debtor's income potential after his injury which gave rise to the annuity."  (<u>Id.</u>).  He then reasons:

> The provision requiring Debtor to pay Movant $680.00 monthly from the proceeds of the sale being support is counterintuitive considering the disparity in finances and the absence of a reciprocal alimony provision to Debtor's benefit.

---

[18]    The inferences set out in the text are the ones that seem more likely than not based on the content of the MSA.  To the extent that they may be incorrect, the burden was on the Debtor to make a factual record regarding the intent and meaning of the relevant provisions of the MSA.  <u>See</u> 11 U.S.C. §363(g).  He did not.

(Id. at 15).

The inference that the Debtor asks me to draw regarding the parties' intent in entering

into the MSA in 2009 is simply unwarranted.  The Debtor is correct that the MSA provides for a

52/48% split in the Debtor's favor of the net proceeds the parties expected to receive from the

sale of the Residence and a 60/40% split of the minor children's medical and college expenses

(with the Debtor shouldering the lesser burden).  Perhaps those provisions support the inference

that, in September 2009, Ms. Miller's earning capacity or overall financial condition was

superior to the Debtor's to some degree.  However, even assuming that the Debtor's earning

capacity was less than Ms. Miller's when they entered into the MSA,[19] that fact, by itself, does

not establish that the obligation labeled as support in the MSA was truly a disguised form of a

division of marital assets.  The parties' relative financial condition certainly is a factor in

determining the level of support that the non-custodial spouse is obliged to contribute, but it does

not nullify the Debtor's duty to support his children.  See Pa. R. Civ. P. 1910.16-1 to 1910.16-7

(Pennsylvania support guidelines for determining the level of support a parent owes a child).[20]

The parties' agreement to provide the Debtor with a larger share of the division of marital

property and to impose a lesser payment obligation with respect to certain aspects of their

children's ongoing needs does not establish that the MSA neglected to address the Debtor's duty

---

[19]    I emphasize that I am not making that finding.  I have no quantitative information
whatsoever regarding the parties' relative financial conditions in September 2009.

[20]    The support guidelines "set forth the amount of support which a spouse or parent should
pay on the basis of both parties' net monthly incomes as defined in Rule 1910.16-2 and the number of
persons being supported."  Pa. R. Civ. P. 1910.16-1(a)(1).

-27-

to pay child support and that all of the economic terms of the MSA were purely "equitable

distribution."

     For these reasons, the MSA provisions regarding "support deferral," property allocation

or the medical/college expense allocations in the MSA, do not persuade me that the Debtor's

$680.00 per month payment obligation was anything other than what the parties labeled it to be

– a support obligation.  For purposes of the Bankruptcy Code, I find that the State Court's

determination of $18,360.00 of past-due child support and the Debtor's ongoing payment

obligation under the MSA to be in the nature of support and therefore, a DSO.[21]


## 4.

     The next question is whether, pursuant to 11 U.S.C. §362(b)(2)(B), the automatic stay

applies to actions Ms. Miller might take in the State Court to attempt to collect the past due and

ongoing DSO from the Annuity.  Ms. Miller acknowledges that she cannot proceed against the

Annuity (without relief from the automatic stay) if the Annuity is property of the bankruptcy

estate.  She does not dispute that the Annuity was a property interest of the Debtor that became

---

[21]     I note the limited context in which this finding is made.

     Since 1978, bankruptcy court determinations whether a marital debt was in the nature of
support have arisen commonly in dischargeability proceedings.  Such proceedings are conducted as
adversary proceedings, see Fed. R. Bankr. P. 7001(6), which have all of the formal characteristics of full,
civil litigation (e.g., complaint, answer, discovery, trial).  In contrast, this is a summary proceeding,
conducted within thirty (30) of the filing of Ms. Miller's Motion, in which the bankruptcy court must
decide the ongoing scope of the automatic stay.  Stay relief contested matters "do not involve a full
adjudication on the merits of claims, defenses, or counterclaims . . . ."  In re Sunshine Three Real Estate
Corp., 2009 WL 3617798, at *7 (Bankr. D. Mass. Oct. 26, 2009).  Findings made in such contested
matters are akin to those made during a preliminary injunction hearing: that the successful party is more
likely than not to prevail on the issue in later, plenary litigation.  See In re Northwest 15th Street
Associates, 435 B.R. 288, 304 (Bankr. E.D. Pa. 2010).

estate property under 11 U.S.C. §541(a) upon the commencement of the case.  She argues only

that once the Debtor exempted the Annuity it was no longer property of the estate and became

subject to her DSO collection rights under the §362(b) stay exception.

As stated in Part III.B., supra, a claimed exemption of property from the bankruptcy estate

"become effective" when the deadline for objection under Rule 4003(b)(1) has expired and no

objections have been filed.  That has not occurred in this case.  The exemption deadline is thirty

(30) days after the conclusion of the §341 hearing.  Fed. R. Bankr. P. 4003(b)(1).  The docket

reflects that the §341 hearing has not been concluded.  (See Doc. #42).

As a result, the Annuity currently is property of the bankruptcy estate.  It follows that the

§362(b) exception to the automatic stay is inapplicable; the stay is in effect with respect to the

Annuity.

**5.**

The final question with respect to the ongoing and past due DSO is whether Ms. Miller

should be granted relief from the automatic stay for "cause" pursuant to §362(d).  As stated in

Part III.C.1, supra, this is largely a question whether "the equities of freeing the creditor from the

restraint of the automatic stay may outweigh the potential negative impact that such relief would

have on the bankruptcy process."  Bell, 476 B.R. at 179.

The ongoing DSO obligation must be considered separately from the amounts that were

past due when the bankruptcy case was filed.

With respect to the Debtor's ongoing DSO, the Debtor has presented no serious defense.

The equities and public policy indisputably favor Ms. Miller's  right to enforce her present and

ongoing child support rights.  There is no countervailing bankruptcy policy that would justify

-29-

restraining Ms. Miller from enforcing those rights.  Congressional policy elevating the status of

pre-petition state court support orders is manifested in several Code provisions, most notably 11

U.S.C. §101(14A)(C) and §362(b)(2)(C).  As one court observed:

> [The 2005 amendments were] intended to strengthen the rights of a spouse and
> children by redefining their support as a "domestic support obligation" regardless
> whether "established or subject to establishment before, on, or after" bankruptcy.
> § 101(14A)(C).  [Unless] motivated by acrimony, not uncommon in divorce
> proceedings, it is difficult to understand the debtor's motive in pressing his
> objection to the relief sought by the movant, since even if, arguendo, [the
> §362(b)(2)(C) exception is inapplicable, the movant] could simply seek relief
> from the automatic stay for cause, see § 362(d)(1); and, it would be difficult to
> find a more compelling cause than the need for support, especially where children
> are involved.

In re Peterson, 410 B.R. 133, 135 (Bankr. D. Conn. 2009) (emphasis deleted).   Indeed, unless the

Debtor fully satisfies his post-petition DSO obligation, he many not confirm a chapter 13 plan.

See 11 U.S.C. §1325(a)(8).[22]

Consequently, I will grant Ms. Miller relief from the automatic stay to enforce her right to

collect from property of the estate the DSO obligation falling due  post-petition.

In comparison to the Debtor's ongoing duty to pay his DSO, consideration of Ms.

Miller's request for relief to collect the Debtor's past due DSO from property of the estate

requires a more nuanced balancing of competing interests.  Certainly, the interests of a DSO

creditor such as Ms. Miller in promptly collecting past due support is entitled to considerable

---

[22]    11 U.S.C. §1325(a)(8) sets forth one of the conditions of a confirmable plan:

> the debtor has paid all amounts that are required to be paid under a domestic
> support obligation and that first become payable after the date of the filing of the
> petition if the debtor is required by a judicial or administrative order, or by
> statute, to pay such domestic support obligation.

weight.  See Cartledge v. Miller, 457 F. Supp. 1146, 1154 (S.D.N.Y. 1978) ("An important and

pervasive state law policy is to enforce the support rights of dependent spouses and children"); In

re Elmasri, 369 B.R. 96, 102 (Bankr. E.D.N.Y. 2007) (same); see generally In re Cox, 186 B.R.

744, 746 (Bankr. N.D. Fla. 1995) ("The federal government's need for the repayment of student

loans, while an important policy objective, does not approach a family's need for the immediate

payment of alimony or child support obligations.").

    At the same time, however, the past due DSO is a priority claim in the bankruptcy case,

see 11 U.S.C. §507(a)(1)(A).  As such, it must be provided for in a debtor's chapter 13 plan.  See

11 U.S.C. §1322(a)(2) (a chapter 13 plan "shall provide for the full payment, in deferred cash

payments, of all claims entitled to priority under section 507 of this title, unless the holder of a

particular claim agrees to a different treatment of such claim").  Thus, Congress contemplated

that DSO arrears may be addressed in a chapter 13 plan.  See Collier Family Law and the

Bankruptcy Code ¶8.04[1] (Henry J. Sommer and Margaret Dee McGarrity 2013) ("Collier

Family Law").

    In this case, the Debtor has proposed a chapter 13 plan that provides for full payment of

his priority claims, including Ms. Miller's DSO.  Thus, the question is not whether Ms. Miller

will be repaid the delinquent DSO, but rather, which court will set the repayment terms.  Should

this be done by the state court under applicable nonbankruptcy law or by the bankruptcy court

consistent with 11 U.S.C. §§1322(a)(2), §1325(a)?

    In this context, even if I were to assume that there is some presumption in favor of the

application federal bankruptcy law in this context, the interests of the DSO creditor are

considerable.  Treatment of past due support in a chapter 13 plan may delay collection of the

debt.  Bankruptcy courts should interfere as little as possible with the operation of state courts in

establishing and enforcing child support orders.  See, e.g., In re Diaz, 647 F.3d 1073, 1092 n.16

(11th Cir. 2011).

Consequently, when a DSO creditor seeks relief from the automatic stay to proceed in

state court to collect a past due DSO that is provided for in the debtor's plan as a priority debt,

the determination whether "cause" exists to grant relief from the automatic stay requires that the

bankruptcy court evaluate whether the case has been filed in good faith, much in the same

manner as the court determines whether the automatic stay should be extended under 11 U.S.C.

§362(c)(3)(B).  Essentially, this is a determination whether the case was filed in both subjective

good faith (for a proper bankruptcy purpose and not merely for delay or to target a particular

creditor) and objective good faith (i.e., there is some reasonable prospect that the chapter 13

rehabilitation will be successful).  See, e.g., In re Ferguson, 376 B.R. 109, 123-25 (Bankr. E.D.

Pa. 2007).[23]  If the debtor establishes his or her good faith, as a general proposition, relief from

the automatic stay is not warranted.  See In re Jacobson, 231 B.R. 763, 765 (Bankr. D. Ariz.

1999) (in light of first priority status of DSO claims, "granting relief from stay in a Chapter 13

case in order to allow enforcement of those obligations in a state court should now be the

exception rather than the rule").[24]

_____

[23]        The "objective test" to which I refer also is similar to the test employed in automatic stay
litigation under §362(d)(2) in determining whether property is necessary to effective reorganization.
The §362(d)(2) standard is whether "there is a reasonable possibility of achieving an effective
reorganization within a reasonable period of time."  See In re Mullock, 404 B.R. 800, 806 (Bankr. E.D.
Pa. 2009) (citing authorities).

[24]        I note that there is some tension between the legal principles set out in the text and 11
U.S.C. §362(b)(2)(C).  When that provision is applicable, the DSO creditor may proceed in state court to
                                                                                (continued...)

-32-

In this case, I conclude that the Debtor's defense under §362(d) founders on the objective

good faith prong.

The Debtor's makes the classic argument.  Stay relief is inappropriate because the past

due DSO is provided for, in full, in his chapter 13 plan as a priority claim.  However, the Debtor

made no showing that his plan appears sufficiently feasible to justify the continued restraint on

his dependents in enforcing their support rights, even under the diluted standard that applies early

in a reorganization bankruptcy case.[25]  Simply put, I have no record to evaluate the prospects that

the Debtor's chapter 13 plan will succeed.

Further, even if I were to take into consideration the information in the Debtor's

bankruptcy schedules, which were filed with this court under oath, the Debtor would fail to make

his case.[26]

---

[24](...continued)
obtain a withholding of income, even from property that is property of the estate.  On its face, this
statutory exception to the stay does not distinguish between ongoing support and past due, pre-petition
support claims that are provided for in a chapter 13 bankruptcy debtor's plan.  Perhaps in that situation,
the Code shifts the burden to the debtor to seek the imposition of a non-automatic stay from the
bankruptcy court to prevent a withholding from the income the debtor requires to fund the chapter 13
plan payments.  I have not ruled on this issue in this case because the parties did not raise it.

[25]        When the feasibility of a reorganization plan is considered early in a case in the context
of motion for relief from the automatic stay or a motion to dismiss a case, the standard is less stringent, to
avoid transforming the hearing on the motion into a premature confirmation hearing.  E.g, Mullock, 404
B.R. at 806-07 (citing authorities).

[26]        Neither party moved the Debtor's income and expense schedules (Schedules I and J) into
evidence at the hearing.  I may take judicial notice of the content of the bankruptcy schedules for the
purpose of ascertaining the timing and status of events in the case and facts not reasonably in dispute.
See Fed. R. Evid. 201; In re Scholl, 1998 WL 546607 (Bankr. E.D. Pa. 1998); see also In re Indian Palms
Associates, 61 F.3d 197, 205 (3d Cir. 1995).  To the extent that the disclosures in Schedules I and J
support the Debtor's position, it is doubtful that they set forth facts that reasonably are not in dispute and
it would be unfair to Ms. Miller to consider the Debtor's out of court statements which were not subject
to cross examination at the hearing.  However, to the extent that the information in the schedules

(continued...)

In Schedule I, the Debtor shows monthly income totaling $4,746.63.[27] (Doc. # 15). In Schedule J, the Debtor shows monthly living expenses of $6,797.41, with a monthly deficit of $2,050.78. (Id.). When his proposed chapter 13 plan monthly payment of $429.55 is added to the deficit, the shortfall in the disclosed monthly budget is $2,480.33.

Even assuming that the Debtor's housing expenses (disclosed as $2,634.10 for mortgage and $342.01 for electric, heat and water utilities) may decrease significantly once the Residence is sold and the Debtor finds other housing, it is difficult to envision how the Debtor will have reduced this expense sufficiently to provide for his disclosed expenses and chapter 13 plan obligation. At a minimum, given the Debtor's income and expense disclosures in the Schedules, it was incumbent upon him to provide some further explanation demonstrating that his proposed plan was not filed merely to thwart his ex-wife's DSO collection efforts and that the plan has

---

[26](...continued)
undercuts the Debtor's position, it is more in the nature of an admission and Ms. Miller should have no objection. As for the Debtor, he retains the right to dispute the propriety the court considering the sworn statement he filed with the court in his bankruptcy schedules. See Fed. R. Evid. 201(e) ("If the court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard").

I reiterate that I have considered the schedules only for the sake of being complete and thorough. Even without consideration of the schedules, the Debtor made no showing to support the feasibility of his chapter 13 plan.

[27] The monthly income consists of:

| $ 610.44 | net income from employment |
| 1,621.00 | Social Security |
| 2,487.94 | the Annuity |
| 27.25 | pro-rated 2012 tax refund |

some reasonable prospect of success.[28]

In short, Ms. Miller met her burden of production on the question whether there is cause for relief from the automatic stay and the Debtor failed to satisfy his burden of proof.  See 11 U.S.C. §362(d)(1), (g).  Consequently, I will grant Ms. Miller relief to invoke all of her state court remedies, including those directed against property of the estate, in order to collect the both the past-due pre-petition and ongoing DSO obligation.

### C.  The $8,000.00 Obligation Owed to Calvin

Ms. Miller also seeks relief to proceed in the State Court to enforce the Debtor's obligation under the MSA to repay Calvin $8,000.00.  The Debtor disputes this debt's status as a DSO.  He depicts that debt as "a separate obligation" to Calvin.  (Debtor's Brief at 12).[29]

---

[28]     I note one item in Schedule J that, is anomalous. The Debtor disclosed his support obligation as "$0.00," but also disclosed a monthly expense of $1,125.00 for "Payments for support of additional dependents not living at your home."  It is unclear to what this expense refers because it exceeds the $680.00 monthly DSO derived from the MSA.  In any event, the Debtor disclosed this line item as a "support" obligation that, presumably, he intends to pay monthly.  Thus, I still do not understand why the Debtor believes that he has the ability to make the payments to the trustee proposed in his chapter 13 plan.

[29]     In support of his argument, the Debtor cites In re Walker, 449 B.R. 838 (W.D. Pa. 2011) for the proposition that an obligation to repay student loans undertaken in a marital settlement agreement is a separate obligation and not a DSO.  (Debtor's Brief at 12).

        The Debtor misstates the holding of the case.  In Walker, the district court affirmed a bankruptcy court decision, see 439 B.R. 854 (Bankr. W.D. Pa. 2010), that determined that a spouse's debt arising from a marital settlement agreement in which the debtor agreed to pay off student loans that both parents had taken for their child (and to hold the non-debtor spouse harmless on the obligation) was dischargeable in the debtor's chapter 13 case.  However, nothing in either the bankruptcy court opinion or district court opinion suggests that the plaintiff asserted that the obligation was a DSO and there is nothing in either opinion that speaks to the issue of distinguishing a DSO debt from a non-DSO debt. The case merely applies a simple principle that is derived from the plain language of the Bankruptcy Code: a non-DSO debt encompassed by 11 U.S.C. §523(a)(15) is dischargeable under 11 U.S.C. §1328(a).

Based on the content of the MSA, I find that Ms. Miller has come forward with enough evidence to establish that the $8,000.00 debt to Calvin is in the nature of support.

The MSA does not merely require the Debtor to repay Calvin the $8,000.00 he took from an account in Calvin's name.  If that were the extent of the recital in the MSA, I might agree with the Debtor that there is an insufficient evidentiary basis to find that the obligation is anything other than an ordinary debt.  However, the MSA goes further and explains that the purpose of the repayment of the borrowed $8,000.00 is to make funds available for payment of Calvin's college expenses.  The MSA also states that if Calvin transfers or drops out of the college he was then attending, the Debtor will remain obligated on the debt.  While that last provision does provide a measure of support for the Debtor's position, I conclude from the face of the MSA that the predominant purpose of the payment was to provide for his son's education and, for that reason, I find that it was in the nature of support.  See In re Bell, 357 B.R. 167, 172 (Bankr. M.D. Ala. 2006); In re Petrosky, 325 B.R. 475, 477 (Bankr. M.D. Fla. 2005); Collier Family Law ¶6.05[3].

Because the Debtor's $8,000.00 payment obligation to Calvin is a DSO that was past-due as of the commencement of the bankruptcy case, it should be treated in the same manner as the $18,360.00 past due support discussed earlier.  Enforcement of this MSA obligation is not excepted from the automatic stay under 11 U.S.C. §362(b)(2)(B), but relief from the automatic stay is appropriate under §362(d).

### D.  Attorney's Fees

The final issue involves Ms. Miller's request that she be permitted to seek attorney's fees for enforcing her rights under the MSA.  Fee-shifting is provided in Paragraph 25 of the MSA.

The Debtor argues, that, categorically, "attorneys fees awarded . . . in prosecution [of] the equitable distribution [are] not in the nature of alimony, maintenance, or support." (Debtor's Brief at 14). This is a bootstrap argument because it assumes that Ms. Miller seeks to enforce equitable distribution rights, not her DSO rights under the MSA. The more accurate question is whether the award of attorney's fees for enforcing a DSO is itself a DSO.

As a general principle, categorization of attorney's fees arising from domestic relations litigation as a DSO requires that the award be based, to some degree, on the parties' relative financial need. See, e.g., In re Rogowski, 462 B.R. 435, 446 (Bankr. E.D.N.Y. 2011); In re Spence, 2009 WL 3483471, at *4 (Bankr. S.D. Fla. Oct. 26, 2009). By comparison, if the fees were awarded entirely as a matter of contractual fee shifting or as a sanction, for example, it is difficult to justify treating the debt as being in the nature of support. However, when the underlying domestic relations litigation giving rise to the fee award was the establishment or enforcement of a support obligation, many courts have reasoned that such attorney's fees are themselves inherently in the nature of support. See, e.g., In re Hudson, 107 F.3d 355, 357 (5th Cir. 1997) (because purpose of proceeding is to provide support, attorney fees incurred inure to the benefit of dependent party and are in the nature of support); In re Louttit, 473 B.R. 663, 666-67 (Bankr. W.D. Pa. 2012) (citing authorities); In re Herbert, 304 B.R. 67, 78 (Bankr. E.D.N.Y. 2004).[30] Otherwise, the support recipient ends up bearing the costs of obtaining or enforcing the

---

[30]      Curiously, the Debtor cites Louttit in support of his position. Louttit is to the contrary. The court held that an attorney's fee award granted in a child custody case, "prompted by the Plaintiff's willful ignorance of the Tribal Court's custody proceeding," which "caused the Defendant to incur the additional costs associated with the concurrent litigation and the subsequent appeals," was a nondischargeable DSO. 473 B.R. at 668.

support award, thereby reducing the actual support the court determined the recipient was entitled

to receive.

In Pennsylvania, the award of counsel fees in connection with the establishment and

enforcement of support orders is discretionary with the court and that the relative financial needs

of the parties may be considered by the court.  See 23 Pa. C.S.A. §4351; Bowser v. Blom, 807

A.2d 830, 836 (Pa. 2002) (discretionary award of counsel fees would be appropriate "where the

incomes of the parties is so disparate . . . or where the obligee's financial situation is so strained

that the cost of the action would necessarily affect the child"); Kraisinger v. Kraisinger, 34 A.3d

168, 177 (Pa. Super. Ct. 2011) (award of counsel fees is discretionary).

In this case, the State Court awarded Ms. Miller counsel fees of $3,500.00 for

enforcement of the DSO arrears that accrued prior to January 2013.  However, the State Court's

order does not explain the basis for the court's determination.  Certainly, the circumstances

underlying the award  – a longstanding failure to pay the child support required by the MSA  –

suggests that the State Court may well have perceived the award as an aspect of the support

obligation itself.  Absent reimbursement for counsel fees, it is reasonable to expect that Ms.

Miller may have had to devote resources toward the payment of legal fees that otherwise would

have been available to support her dependent children.  At the same time, however, the fees may

have been awarded based on the Debtor's failure to comply with provision of the MSA having to

with subjects other than support.  Furthermore, the MSA has a simple fee-shifting agreement that

does not appear dependent upon consideration of relative financial condition of the parties.  See

generally McMullen v. Katz, 985 A.2d 769, 776-77 (Pa. 2009) (treating award of counsel fees in

enforcing marital settlement agreement with fee-shifting provision as matter of contract, but

holding that court may consider whether fees claimed are reasonable and may reduce fees claimed if appropriate).

In these circumstances, I conclude, somewhat reluctantly, that Ms. Miller has not established that the attorney's fees claim is a DSO due to the uncertainty regarding the State Court's intent in awarding fees.  However, I consider it appropriate, in the exercise of my discretion, to modify the automatic stay to permit Ms. Miller to seek a clarification from the State Court regarding the January 9, 2013 attorney's fee award, but not to enforce the award at this time.  If the State Court clarifies that the award was designed, in material part, to provide a support function because it was based on the needs of the dependent children, then the attorney's fee award, like the other aspects of the January 9, 2013 contempt order, will be treated as a DSO and, upon a renewed request to this court, I will be prepared to grant relief from the automatic stay under 11 U.S.C. §362(d).  If the attorney's fee award is not a DSO, the Debtor will retain the power to treat it as a general unsecured claim in his chapter 13 plan.

Similarly, with respect to Ms. Miller's request for counsel fees for prosecuting the Second Contempt Petition, I will modify the automatic stay to grant Ms. Miller authority to seek, but not enforce any attorney's fees that the State Court might award to permit the State Court to explain the basis for any award it might grant and to provide this court to consider the DSO or non-DSO nature of the award.

# V. CONCLUSION

For the reasons set forth above, Ms. Miller's Motion will be granted in large part, but also denied in part. An order consistent with this Opinion will be entered.


**Date: <u>November 14, 2013</u>**                          _____
                                                            **ERIC L. FRANK**
                                                            **CHIEF U.S. BANKRUPTCY JUDGE**